UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| EDWARD THOMAS WILSON, | Case No. 2:98-cv-01174-GMN-BNW |
| Petitioner, | ORDER |
| v. | |
| JEREMY BEAN,[1] *et al.,* | |
| Respondents. | |

Before the court for a decision on the merits is an application for a writ of habeas corpus filed by Edward Thomas Wilson, a Nevada prisoner sentenced to death. ECF No. 134.

I.   FACTUAL AND PROCEDURAL BACKGROUND

On October 3, 1979, Wilson entered guilty pleas in the state district court for Washoe County, Nevada, to charges of first-degree murder and robbery with the use of a deadly weapon. A week later, he entered a guilty plea to the charge of kidnaping with the use of a deadly weapon.  After a penalty hearing in December 1979, a three-judge panel sentenced him to death.[2]

In May 1980, Wilson filed a motion to withdraw his guilty plea.  The state district court held a one-day hearing in June 1980 that was continued until September 1980 to allow for

---

[1] Petitioner is currently incarcerated at High Desert State Prison.  Thus, Jeremey Bean, the warden of that facility is substituted as the primary respondent in this case. *See* Fed. R. Civ. P. 25(d); *Rumsfeld v. Padilla*, 542 U.S. 426 (2004).

[2] Wilson's three co-defendants – John Olausen, Fred Stites, and David Lani – also pleaded guilty to first-degree murder and were tried at the same penalty hearing.  Olausen also received the death penalty. Stites and Lani were sentenced to life in prison without the possibility of parole.

testimony from Wilson's trial counsel.[3]

After the state district court denied his motion to withdraw his plea in March 1981,

Wilson appealed his judgment of conviction and sentence. In its opinion deciding the appeal,[4]

the Nevada Supreme Court recounted the facts of the case as follows:

> In the afternoon of June 24, 1979, Officer James Hoff of the Reno Police Department, posing as a narcotics dealer, met with appellant Wilson to discuss a drug transaction in which Wilson was to sell Hoff ten ounces of cocaine for $16,000. During the meeting, Wilson and Hoff made arrangements for the sale to take place that night around midnight. Later in the day, Wilson, along with appellant Olausen, approached David Lani and Fred Stites in a duffel bag and told them that they were making a drug deal and that they wanted to murder the dealer. Wilson then asked Lani and Stites to assist in the murder. The four proceeded to discuss how and where the killing could be done. Lani told the group that he knew a place by the Riverside Convalescent Center where the killing could take place. They then devised a plan to kill Hoff because they wanted to take the money and they did not want any witnesses.

> All four purchased baking powder as a substitute for the cocaine. Later on in the evening they placed the baking powder and three knives in a duffel bag and walked to the Convalescent Center. Once there, they cut and gathered bushes under which to hide when Wilson returned with Hoff. Wilson then left the area to contact Hoff. Meanwhile, the other three remained at the Convalescent Center where they hid in the bushes, each armed with a knife.

> On June 25th at 12:10 a.m., Hoff met Wilson at the El Tavern Motel in Reno. Before this meeting, Hoff had obtained $16,000 in $100 bills which were photocopied and their serial numbers recorded. Then Hoff and another officer installed a Kel listening device on Hoff's vehicle. Finally, numerous surveillance teams were dispatched throughout the area to observe the transaction. Unfortunately, shortly after Hoff met Wilson, the listening device malfunctioned; therefore, both audio and visual contacts were lost on several occasions throughout the night.

> After the rendezvous, Hoff and Wilson drove around Reno until approximately 1:30 a.m., at which time Hoff parked the car in a wooded area near the Riverside Convalescent Center. As Hoff and Wilson got out of the car, Lani jumped out of the bushes and stabbed Hoff in the back. The others came out of their hiding places and together stabbed Hoff an additional eight times. About fifteen minutes later, the vehicle left the wooded area at a high rate of speed heading west toward Verdi, Nevada.

> The vehicle was lost by the surveillance teams somewhere near Verdi and it was not spotted again until approximately 3:15 a.m. At that time, backup units were called in to stop the car. Nevertheless, the car was not found until much

---

[3] Olausen also filed a motion to withdraw his guilty plea. The hearing addressed both motions.

[4] Olausen and Wilson's cases were consolidated on direct appeal.

later.  It was unoccupied and stained with blood.

After discovery of the automobile, a search for Hoff and the suspects was initiated.  In the afternoon of June 25th, appellants were found sleeping in some bushes alongside a trailer park.  On the ground between appellants, officers found a vest containing $1,670.  Fourteen of the sixteen hundred dollar bills in the vest matched those photocopied by Hoff.  Wilson and Olausen were immediately placed under arrest.  A few hours later, officers found the body of James Hoff buried under a pile of rocks in a drainage ditch in Verdi, Nevada.  Stites and Lani were subsequently arrested in Oklahoma.  They were returned to Nevada, after which all four defendants pleaded guilty.

*Wilson v. State*, 664 P.2d 328, 330 (Nev. 1983) (*Wilson I*) (footnote omitted).  The Nevada

Supreme Court affirmed Wilson's judgment of conviction and sentence and subsequently denied

rehearing.

In December 1986, Wilson filed his first state petition for post-conviction relief.  The

state district court held a lengthy evidentiary hearing in May 1987 and subsequently denied

relief.[5]  In March 1989, the Nevada Supreme Court affirmed the lower court's decision.  Wilson

filed his first federal petition for a writ of habeas corpus in June 1989 (case no. CV-S-89-432).

In December 1992, this court dismissed Wilson's mixed federal petition (i.e., a petition

containing exhausted and unexhausted claims) and instructed him to file a new federal petition

within 30 days of completing state court exhaustion proceedings.  Wilson filed a state court

petition in March 1993.  That petition was dismissed by the state district court.  In April 1998,

the Nevada Supreme Court dismissed Wilson's appeal of that decision, upholding the state

district court's conclusion that the petition was barred as successive.

In August 1998, Wilson filed a habeas petition in this court under case number CV-S-89-

432, which the court re-designated as case number CV-S-98-1174 (i.e., the instant case).  In

September 2005, this court granted Wilson a stay to allow him to exhaust his claims under

*Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *McConnell v. State*, 102 P.3d 606 (Nev.

2004).

The state district court dismissed Wilson's subsequent state petition as untimely and

---

[5] The hearing and the court's decision denying relief also addressed Olausen's petition for post-conviction relief and the two cases were again consolidated on appeal.

3

successive.  Wilson appealed that decision and also filed yet another petition in the state district court, this time raising a claim under *Byford v. State*, 994 P.2d 700 (Nev. 2000), and *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007).  The Nevada Supreme Court affirmed the dismissal of the former petition in October 2011 and the dismissal of the *Byford/Polk* petition in September 2014, in both instances upholding the lower court's conclusion that the petitions were barred as untimely and successive.

After this court lifted the stay in March 2015, Wilson filed, in May 2015, a third amended petition.  Respondents moved to dismiss, arguing claims in the petition were procedurally defaulted, failed to state a claim upon which relief can be granted, and/or time-barred.  Respondents also contended that Wilson's entire petition was filed beyond the one-year statute of limitations under 28 U.S.C. 2244(d).  The court granted the motion, in part, and dismissed Claims 1(C), 1(E), 3, 7, 10, 11, and 17 through 30.

In August 2017, the respondents filed an answer to the remaining claims in the petition.  With his traverse, Wilson filed a motion for evidentiary hearing and motion for discovery.  Respondents opposed the motions and filed a reply to the traverse.  The court denied the motion without prejudice to Wilson renewing the motions with a more particularized showing that the holding in *Martinez v. Ryan*, 566 U.S. 1 (2012), applies to distinct trial ineffective assistance of counsel (IAC) claims in his third amended federal petition and that he is entitled to an evidentiary hearing in relation to those claims.

Wilson did not file any further motions attempting to make such a showing.  The court now addresses his remaining habeas claims on the merits.

II.  STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  AEDPA provides the following standard of review:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) *(Terry Williams)*. An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA

5

1    standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings,

2    which demands that state-court decisions be given the benefit of the doubt") (internal quotation

3    marks and citations omitted).

4         "[A] federal court may not second-guess a state court's fact-finding process unless, after

5    review of the state-court record, it determines that the state court was not merely wrong, but

6    actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El*,

7    537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual

8    determination will not be overturned on factual grounds unless objectively unreasonable in light

9    of the evidence presented in the state-court proceeding, § 2254(d)(2).").  Because *de novo* review

10   is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254

11   by engaging in *de novo* review rather than applying the deferential AEDPA standard. *Berghuis v.*

12   *Thompkins*, 560 U.S. 370, 390 (2010).

13        III.  EVIDENCE TO BE CONSIDERED

14        In his reply, Wilson argues that, because he has presented colorable claims of ineffective

15   assistance of trial counsel and post-conviction review (PCR) counsel, *Martinez v. Ryan* allows

16   him to add evidence to his IAC claims without the usual evidentiary limitations imposed by 28

17   U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(e)(2). ECF No. 195 at 60-61.[6]  Citing to *Dickens v.*

18   *Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (en banc), he contends that *Martinez* "applies to

19   claims, like those in [his] May 2015 Federal Petition, that are 'new' because federal habeas

20   counsel 'substantially improved' upon a version of the claim presented to the state court." *Id*. at

21   47.  As noted above, Wilson filed motions for an evidentiary hearing and for discovery that the

22   court denied without prejudice to Wilson renewing the motions with a more particularized

23   showing that *Martinez* allows him to further develop the evidence underlying his claims. ECF

24   No. 221.

25        Wilson has not attempted to make such a showing.  In addition, the U.S. Supreme Court

---

[6] Citations to page numbers for ECF documents refer to the blue ECF page number in the upper right-hand corner of the imaged document.

has since issued a decision holding that "a federal habeas court may not conduct an evidentiary

hearing or otherwise consider evidence beyond the state-court record based on ineffective

assistance of state postconviction counsel." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022).  The

Court determined that *Martinez* did not disturb the long-standing rule that a habeas petitioner

bears the risk for his or her post-conviction counsel's deficiencies in developing the state court

record. *Id*. at 1735-38.  So, even under *Martinez*, a federal court may not consider new evidence

on the merits of a claim unless the petitioner satisfies the stringent requirements of 28 U.S.C. §

2254(e)(2). *Id*.  If those requirements are not met, § 2254(e)(2) prohibits the federal habeas court

from considering evidence not presented to the state court in the manner prescribed by state law.

*Williams v. Taylor*, 529 U.S. 420, 437 (2000) *(Michael Williams)*.  In addition, a federal court

cannot consider evidence that was not before the state court when considering any question

adjudicated on the merits in state court. *Pinholster*, 563 U.S. at 181.  Consequently, this court

cannot consider much of the proffered evidence Wilson relies upon to support his habeas claims.

## IV.  ANALYSIS OF CLAIMS

### Claim One

In Claim One, Wilson claims that his conviction and death sentence are unconstitutional

because he was deprived of effective assistance of counsel in the guilt phase of the criminal

proceeding.  To demonstrate ineffective assistance of counsel in violation of the Sixth and

Fourteenth Amendments, a convicted defendant must show 1) that counsel's representation fell

below an objective standard of reasonableness under prevailing professional norms in light of all

the circumstances of the particular case; and 2) that it is reasonably probable that, but for

counsel's errors or omissions, the result of the proceeding would have been different. *Strickland

v. Washington*, 466 U.S. 668, 687–94 (1984).  When the ineffective assistance of counsel claim

bears on a defendant's decision to enter a guilty plea, the *Strickland* prejudice prong requires the

petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he

would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474

U.S. 52, 59 (1985).

Wilson's claim of IAC in the guilt phase consists of three parts – (A), (B) and (D).[7]

### 1. 1(A) -- Investigation

In part (A) of Claim One, Wilson alleges his trial counsel, Thomas Brennan, was ineffective in failing to meaningfully investigate Wilson's innocence. Wilson claims effective counsel would have (1) searched for and interviewed a potential witness identified as Charles "Bud" Taylor, (2) cross-examined key prosecution witnesses whose testimony was fabricated, (3) carefully examined the crime scene, and (4) pursued discovery of critical physical evidence.

According to Wilson, Bud, an older man who lived in same hotel (the Reef Hotel) as Wilson and Olausen, was the one who came up with idea of selling ten ounces of baking soda represented as cocaine to a drug dealer for $16,000 and instructed Wilson and Olausen how to carry out the deal. Wilson contends that counsel could have used evidence that Bud was the mastermind to lessen Wilson's culpability for Hoff's murder.

Wilson has not presented any convincing evidence that Bud played a significant role in Wilson's criminal acts. At the hearing on Olausen and Wilson's motions to withdraw their guilty pleas, Brennan testified that he offered the district attorney information about Bud in exchange for the district attorney not seeking the death penalty but that the district attorney rejected the offer. ECF No. 148-1 at 151-52. Wilson's petition and reply contain a detailed account of Bud's role in the scheme to rip off a drug dealer, but, for the most part, the account is not substantiated with citations to the source of the information. ECF No. 134 at 4-6, ECF No. 195 at 63-65. Lynn Stefansky, the police informant who put Wilson in contact with Hoff and who also lived in the Reef Hotel, testified at the penalty hearing that Bud was drunk every time she saw him and that she was not aware of any discussions between Wilson and Bud about stealing money in a drug deal. ECF No. 154-3 at 140-41. In the absence of any substantial evidence that Bud was

---

[7] Parts (C) and (E) were dismissed for failure to state a claim upon which habeas relief can be granted. ECF No. 177 at 11-12.

1 somehow responsible for Wilson's conduct, Wilson has not demonstrated Brennan's failure to

2 investigate Bud constituted ineffective assistance of counsel.

3      In claiming counsel was ineffective in failing to cross-examine key prosecution witnesses

4 whose testimony was fabricated, Wilson incorporates by reference Claims Nine, and Fourteen

5 through Seventeen.  Thus, the court is left to assume that he is referring to Stefansky, John

6 Dollar, Thomas Rogers, William Mendenhall, and James McCall.  Dollar accompanied Lani,

7 Stites, and Stites' brother on a trip to Las Vegas a couple of days after the murder.  The latter

8 three witnesses were jailhouse informants.

9      Each of these witnesses were cross-examined at the penalty hearing by Brennan and the

10 attorneys representing the other co-defendants.[8]  To varying degrees, their testimony was

11 discredited.  More to the point, with the exception of Dollar,[9] Wilson fails to explain or

12 demonstrate how Brennan's alleged failure to interview or investigate these witnesses might

13 have affected his decision to enter guilty pleas.[10]

14      The remaining allegations that Brennan failed to carefully examine the crime scene or

15 pursue discovery of critical physical evidence also fail to establish grounds for habeas relief.  At

16 the hearing on Olausen and Wilson's motions to withdraw their guilty plea, Brennan testified

17 that his investigation included a visit to the crime scene. ECF No. 148-1 at 152.  Wilson does not

18 explain or demonstrate how a more careful examination of the crime scene would have

19 benefitted his defense.

20      The physical evidence Wilson faults Brennan for not investigating consists of a mattress

21 from Lani and Stites' room at the El Tavern motel and a copy of the tape from the Kel

22 transmitter placed in the Datsun Hoff and Wilson were riding in on the night of the murder.

---

23
24 [8] Stefansky (ECF No. 145-3 at 134-54), Dollar (ECF Nos. 145-3 at 201-12, 146-1 at 2-25), Rogers (ECF No. 146-1 at 46-57), Mendenhall (ECF No. 146-1 at 70-91), and McCall (ECF No. 146-1 at 101-11).

25
26 [9] The State used Dollar's testimony to support the kidnaping charge.  For reasons discussed below in relation to Ground 5, Brennan was ineffective in failing to investigate or interview Dollar prior to advising Wilson to plead guilty to kidnaping.

27 [10]  Counsel's alleged ineffectiveness with respect to these witnesses in the penalty is addressed below.

28

1    The State suggested that knife slits in the sheet found covering Hoff's body supported the

2    kidnaping charge because they showed that some of his stab wounds occurred after he had been

3    loaded in the car.  According to Wilson, the mattress from the motel room would have disproved

4    that theory.  In particular, Wilson contends that the slits in the sheet would have matched the

5    knife marks in the mattress because Lani and Stites had stabbed the mattress while practicing

6    martial arts.

7    Dr. Joseph Gauthier, the physician who conducted the autopsy on Hoff's body, testified

8    at the penalty hearing that the bloodstained sheet that was covering Hoff's body "had numerous

9    split-like defects which have the configuration of stab wounds." ECF No. 145-3 at 160.

10    However, when cross-examined by Brennan, Dr. Gauthier admitted he could not say whether the

11    sheet was on or off Hoff's body when the body was stabbed, ECF No. 145-3 at 173.  The parties

12    stipulated that there were two beds in the motel room and one of the mattresses had

13    approximately five knife stab defects in it. ECF No. 145-3 at 186.  Later in the hearing, Lani

14    testified that the sheet they used to cover Hoff's body had holes in it because he and Stites had

15    stabbed it with knives while playing around four or five days before the murder. ECF No. 146-1

16    at 177-78.

17    At the hearing on Olausen and Wilson's motions to withdraw their guilty pleas, Brennan

18    testified that it was his understanding that the manager had moved the mattress out of the room

19    and that the mattress that had been taken into evidence by the police was the wrong mattress.

20    ECF No. 148-1 at 169, 178-81.  He further testified that, in his opinion, the mattress could only

21    be damaging to his client because if the holes in the sheet matched the holes in the mattress the

22    State could argue that it showed that defendants were practicing inflicting stab wounds, which

23    supported a finding of premeditation and deliberation. *Id*. at 178-79.

24    Aside from whether that was sound reasoning, Wilson has not shown that there is a

25    reasonable probability that, with more effort, Brennan would have been able to both recover the

26    mattress and demonstrate that the knife marks in the mattress matched the slits in the sheet.  And,

27

28

even if Brennan was able to do both, it would have benefited Wilson only with respect to defending the kidnaping charge, not the first-degree murder charge.[11]  Without a showing that it would have produced evidence favorable to his first-degree murder defense, Wilson has not established a reasonable probability that he would have insisted on going to trial on that charge if counsel had pursued discovery of the mattress.

As for the Kel listening device, Gary Eubanks, one of the police officers who surveilled Hoff on the night of the murder, testified at the penalty hearing that the device malfunctioned several minutes after Hoff picked up Wilson. ECF No. 145-3 at 32.  According to his testimony, the transmitter "was emitting a very high-pitched squeal with absolutely no conversation [or] vocal transmission whatsoever," but a couple minutes after the car parked in the wooded area near the Riverside Convalescent Center, "the squealing stopped on the audio device and [it] began transmitting in a normal fashion." *Id*. at 38-39.  After several minutes of "dead quiet," Eubanks heard a car door opening and chimes consistent with a car door being open with the keys in the ignition, then movement inside the car with no conversation, followed by a door closing. *Id*. at 40-42.  A couple minutes later, Eubanks heard repeated instances of the doors opening and the car's engine starting up and stopping. *Id*.  As for any speaking, he heard "money" twice, "Did you get enough exercise?" and was "Oh, he's got a gun in the car, too." *Id*. at 42-43.

Eubanks also testified at the penalty hearing that transmissions from the Kel device were not recorded, so there was no tape of what the officers heard. *Id*. at 92.  In a deposition twelve years after the murder, he testified that there was a tape, but he could not recall whether it was ever placed in evidence. Docket #49, Ex. 2, p. 38-39.[12]  According to Eubanks' deposition testimony, the tape would have had nothing on it beyond what he mentioned in his penalty

---

[11] For reason discussed below, this court concludes that Wilson's kidnaping conviction is invalid.

[12] The court's electronic docket does not include images of documents filed prior to September 17, 2004. Much the proffered evidence Wilson relies upon to support his habeas claims was filed prior to that date. Citations to that material herein will identify, by docket number, where it can be found in the court's pre-electronic file for this case.

1    hearing testimony. *Id.*, p. 38-43.

2        At the hearing on Olausen and Wilson's motions to withdraw their guilty pleas, Brennan

3    testified that, while a tape of the recorded transmissions would have been discoverable, he did

4    not recall whether he was provided a tape. ECF No. 148-1 at 176.  He further testified that he did

5    not have the Kel device tested, but it was being tested by the University of Nevada and the

6    results had not been produced before Wilson entered his guilty pleas. *Id.*

7        Here again, Wilson's IAC fails because, apart from whether Brennan was deficient for

8    failing to investigate evidence related to the Kel device, Wilson has not demonstrated a

9    reasonable probability that such efforts would have benefited his defense.  The record shows

10   only a possibility that transmissions from the device were recorded.  There is no evidence in the

11   record to suggest that a tape, if one ever existed, contained information that would have impacted

12   Wilson's decision to plead guilty.

13                    2.  1(B) – Mental impairments

14       In part (B) of Claim One, Wilson alleges Brennan was ineffective in failing to adequately

15   explore his mental impairments and to adequately investigate and present defenses such as

16   insanity and diminished capacity.  To support this claim, Wilson points to a letter he sent his

17   father, dated November 6, 1979, in which he wrote that he was drinking heavily during the two

18   days before the incident and, while he could not remember much of the incident, he had no

19   control over what he was doing. Docket #53, Ex. 54.  He also relies upon mental health

20   evaluations prepared in 2002. Docket #60, Exs. 75/76.

21       There is no evidence in the record beyond Wilson's self-serving statements establishing,

22   or even suggesting, that Wilson was so intoxicated at the time of the homicide that he was unable

23   to form the necessary intent to commit the crimes for which we was convicted.  None of the

24   defendants' statements to the police, including Wilson's, mention him being heavily intoxicated

25   when Hoff was killed.  And, at the change of plea hearing, Wilson reported to the court that he

26   was under the influence of marijuana earlier in the night, but not at the time of the murder, and

27

28
                                   12

that he had not consumed anything other than a couple of joints. ECF No. 145-1 at 14, 21.

Aside from whether this court can consider the mental health evaluations given Wilson's failure to properly present them to the state court in his state PCR proceedings,[13] neither is very compelling.  A report from a psychiatrist, Dr. Daniel P. Greenfield, states that Wilson could not have been acting in "a 'knowing' and 'purposeful' way" due to  his "state of intoxication, fatigue, confusion, fear, surprise, excitement, and other such strong emotions which he experienced at that time." Docket #60, Ex. 75, p. 10.  A report from a forensics expert, Dr. Edward J. Dougherty, opines that Wilson did not act "in a knowing and purposeful manner" due to "severe depressive disorders, Posttraumatic Stress Disorders and Borderline Personality Disorder symptomatology." *Id*., Ex. 76, p. 18.  This falls well short of demonstrating that Brennan could have developed a viable defense to the crimes based on Wilson's mental state.

### 3.  1(D) – Hoff's time of death

In part (D) of Claim One, Wilson alleges Brennan was ineffective in failing to obtain an independent analysis of Hoff's time of death.  According to Wilson, such an analysis would have shown that, as a result of the stab wounds, Hoff was no longer alive when he was loaded into the Datsun and, consequently, there was no factual basis for finding Wilson guilty of kidnaping.  To support the claim, Wilson cites to a 2001 declaration from a forensic pathologist, Dr. Leena K. Jariwala, which states that, in her opinion, Hoff could not have survived more than five to ten minutes after sustaining the injuries identified in Dr. Gauthier's autopsy protocol.  Wilson contends that, based on police reports, Hoff would have had to have remained alive for more than 15 minutes to support the kidnaping charge.

On Brennan's cross-examination at the penalty hearing, Dr. Gauthier testified that determining the length of time Hoff survived would be "pure speculation." ECF No. 145-3 at 173.  He noted that Hoff could have lived up to 15 or 20 minutes or he could have died within 5

---

[13] The evaluations were not presented until Wilson's third state post-conviction proceeding, filed in 2005, that the Nevada Supreme Court dismissed as untimely and successive.

minutes but that there was no way to tell for sure. *Id*. at 173-74.  At the evidentiary hearing on

Wilson and Olausen's state post-conviction petitions,[14] Dr. Byron McGregor, a trauma surgeon

called as a witness for the petitioners, testified that the survival time was "largely speculation,"

but his guess was "on the order of five to 15 minutes." ECF No. 151-1 at 19.  On cross-

examination, Dr. McGregor testified that he did not disagree with Dr. Gauthier's estimate of five

to 20 minutes. *Id*. at 26.  Another witness called by the petitioners, Dr. Gene Llewellyn, a

thoracic surgeon, testified that Hoff would have died within five minutes of receiving the stab

wounds. ECF No. 151-1 at 44.  A third doctor called by the petitioners, Dr. David P. Berry, a

urologist, also testified that he agreed with Dr. Gauthier's range of five to 20 minutes. *Id*. at 73.

Finally, the State called Dr. Gauthier as a witness at the post-conviction hearing.  He testified

that variables such as the victim going into shock and the victim's body position make if "very

treacherous to be dogmatic about how long it would take the victim to bleed to death." ECF No.

152-1 at 8.

　　　　This court agrees that, prior to advising Wilson to enter a guilty plea to kidnaping,

Brennan should have made some effort to determine the likelihood that the State could prove that

Hoff was still alive when he was loaded into the Datsun.  That would have involved an inquiry

into how long Hoff was likely to have survived after being stabbed by Wilson's co-defendants.

Based on evidence presented in Wilson's first post-conviction proceeding, an independent

analysis of Hoff's time of death would have produced essentially the same information as that

provided by Dr. Gauthier's testimony.[15]  So simply interviewing Dr. Gauthier would have likely

sufficed.  Brennan performed ineffectively by failing to do even that.

　　　　That omission contributed to Brennan's ineffectiveness in advising Wilson to plead guilty

to kidnaping.  And, as discussed in relation to Claim Five, below, Wilson there is a reasonable

---

[14] With much of the testimony relevant to both petitions, the state district court heard testimony on both petitions at the same hearing,

[15] Because it was not presented to the state court in this proceeding, this court declines to consider Dr. Jariwala's declaration.

probability that, but for Brennan's errors, he would not have pleaded guilty and would have

insisted on going to trial on the kidnaping charge.  However, the omission had no bearing on

Wilson's decision to enter guilty pleas to the murder or the robbery.  And, because the post-

conviction experts concurred with Dr. Gauthier's penalty hearing testimony as to Hoff's likely

survival time, Wilson has not shown that there is not a reasonable probability the outcome of his

penalty hearing would have been different.

Claim One is denied.

*Claim Two*

In Claim Two, Wilson alleges that his guilty pleas to murder and related crimes are

invalid under the Constitution because they were the product of coercion, ineffective assistance

of counsel, an inadequate plea canvass, and mental incompetency.  The U.S. Supreme Court has

recognized a right under the Due Process Clause to have one's guilty plea be both knowing and

voluntary. *See Boykin v. Alabama*, 395 U.S. 238, 242–43 (1969).  The Court in *Boykin* held that,

to satisfy this requirement, the record must show that the defendant was made aware that he was

waiving his privilege against compulsory self-incrimination guaranteed by the Fifth Amendment,

the right to a trial by jury, and the right to confront one's accusers. *Id*. at 243.  The Court has

identified other prerequisites for a plea to be considered knowing and voluntary.  For example, a

guilty plea is voluntary for due process purposes only if a defendant has received notice of the

true nature of the charges against him. *Henderson v. Morgan*, 426 U.S. 637, 645 (1976).  In

addition, a guilty plea is not "voluntary," and thus invalid, when it is the product of threats,

improper promises, or other forms of wrongful coercion. *See Brady v. United States*, 397 U.S.

742, 754–55 (1970).  Also, a plea of guilty is voluntary and knowing only if it is "entered by one

fully aware of the direct consequences" of his plea. *Id*. at 755.

1. Tricks, threats, and coercion

Wilson contends that Brennan tricked, threatened, and coerced him into pleading guilty to

the charges against him.  He claims that, but for Brennan's unreasonable conduct, he would have

15

insisted on going to trial.  Thus, he presents the claim as an IAC claim in addition to a due

process violation.  Wilson contends that he consistently maintained his innocence and informed

counsel he did not want to plead guilty.  According to Wilson, he was tricked into entering a

guilty plea with an assurance that the death penalty would be off the table if the plea was entered

before the State filed its notice of intent to seek the death penalty.  Wilson also contends that

counsel coerced him into pleading guilty by threatening to withdraw as counsel and by telling

him it was the only way to escape the death penalty.

The voluntariness of Wilson's guilty pleas and Brennan's conduct in relation to the pleas

were litigated in Wilson's motion to withdraw his guilty plea and his direct appeal.  At the

hearing on the Olausen and Wilson's motions to withdraw their guilty pleas, Lani's attorney

(Donald Pope) testified that when all the defendants and their attorneys met, Wilson would

mention that he did not feel that he was guilty. ECF No. 147-6 a 163-64.  Olausen, Olausen's

attorney (James Forman), and Pope all testified to Wilson's resistance to changing his plea to

guilty. *Id*. at 16, 113; ECF No. 148-1 at 29.  Wilson's girlfriend (Kelly Morrissey) and father

(Elmer Wilson) also testified that Wilson did not want to change his plea. ECF No. 148-1 at 49,

61.

As for the ploy to enter guilty pleas before the State filed a notice of intent, Olausen

testified that the defense attorneys told the defendants that they would not get the death penalty if

they were able to do that. ECF No. 147-6 at 19, 72, 95-96.  In his testimony at the hearing,

Forman agreed that the attorneys told the defendants that they wanted to surprise the district

attorney by entering their pleas before he filed the notice of intent. *Id*. at 114.  He noted,

however, that the attorneys saw it merely as an issue to raise on appeal and did not want to get

their clients' hopes up. *Id*.  Pope testified that preserving the issue for appeal was an important

consideration to advising the defendants to change their pleas. *Id*. at 168.  But he also testified

that, at the meeting when it was agreed that the defendants would plead guilty, he did not hear

any of the attorneys guarantee any defendant that he would not receive the death penalty. *Id*. at

16

179.  In addition, he noted that the goal of the attorneys and the defendants was to preserve an issue for appeal. ECF No. 148-1 at 26.  Brennan testified that he thought the issue had a bearing on the case but did not consider it extremely important. *Id*. at 122-23.  He testified that, while the attorneys tried explained to the defendants that the objective was to create an issue for appeal, the defendants placed "more importance [on the issue] than it had." *Id*. at 124.

With respect to threats and coercion, Olausen testified that Stites and Lani and their attorneys indicated that they would do whatever they had to do to place the blame on Wilson if he did not go along with the plan to have all four defendants enter a guilty plea. ECF No. 147-6 at 16-18.  According to Olausen, Wilson was told that he "would surely fry" if Stites and Lani entered guilty pleas and made statements prior to Olausen and Wilson going to trial. *Id*. at 18-19.  Pope testified that, in attempting to convince the defendants that it was in their best interest to plead guilty and go before a three-judge panel,[16] the attorneys would often refer jury in Washoe County as "'hanging juries' and harsher terms as well." *Id*. at 164.  He also testified that, at one of their meetings, Brennan told a story about seeing juror making a hangman's noose. ECF No. 148-1 at 211.  In his testimony, Brennan denied coercing Wilson into entering a guilty plea, but admitted to putting pressure on him to do what Brennan thought was best for him. *Id*. at 155-56.  He testified about letters Wilson had sent to him and to the trial judge (Judge Peter Breen) before the penalty hearing expressing his desire to withdraw his guilty plea. *Id*. at 127-34.  He stated he did not act on those communications because every time he talked to Wilson about it, the discussion ended with Wilson indicating that he did not want to withdraw his plea. *Id*. at 134-35, 153.  He also testified that he asked Judge Breen to not read the letter Wilson had sent him because he did not know what was in it and it could have been detrimental to Wilson's case. *Id*.  Brennan denied making threats, but admitted that he and Wilson discussed him withdrawing if Wilson did not agree with his advice. *Id*. at 126-27, 163.

---

[16] Under Nevada law at the time, a three-judge sentencing panel was appointed  when a defendant pled guilty to first degree murder. Nev. Rev. Stat. § 175.558 (repealed by Laws 2003, c. 366, § 8, eff. June 9, 2003).

Notably, Wilson did not testify at the hearing.[17]  There was testimony, however, about letters Wilson had sent after entering his guilty pleas but prior to the penalty hearing – two to his father and the aforementioned letters to Judge Breen and to Brennan.[18]  These letters express Wilson's insistence on his innocence, his dissatisfaction with Brennan's handling of his case, and his desire to withdraw his guilty plea.

On direct appeal, the Nevada Supreme Court rejected Wilson's claim that his guilty pleas were not freely and voluntarily entered:

> In *Higby v. Sheriff*, 86 Nev. 774, 476 P.2d 959 (1970), we concluded that certain minimum requirements must be met when a judge canvasses a defendant regarding the voluntariness of a guilty plea.  We held that the record must affirmatively show the following: (1) the defendant knowingly waived his privilege against self-incrimination, the right to trial by jury, and the right to confront his accusers; (2) the plea was voluntary, was not coerced, and was not the result of a promise of leniency; (3) the defendant understood the consequences of his plea and the range of punishments; and (4) the defendant understood the nature of the charge, i.e., the elements of the crime. *Id*. at 781, 476 P.2d at 963.  As to this last requirement, we subsequently held that in order for the record to show an understanding of the nature of the charge it is necessary that there be either a showing that the defendant himself understood the elements of the offense to which the plea was entered or a showing that the defendant has made factual statements to the court which constitute an admission to the pleaded to offense. *Hanley v. State*, 97 Nev. 130, 135, 624 P.2d 1387, 1390 (1981).  In the instant case, the record demonstrates that the district judge fully complied with the requirements of *Higby* and *Hanley* by conducting a thorough canvass of Olausen and Wilson before accepting their pleas.  Nevertheless, both appellants contend that their pleas were not freely and voluntarily entered.  We will discuss the claims of each appellant separately below.
>
> [Discussion of Olausen's claim.]
>
> We now turn to Wilson's claim that his plea was not voluntarily entered because he did not understand the consequences of his plea due to a "secret plan" between himself and his attorney.  The nature of this so-called secret plan is as follows: The four attorneys for the various defendants often got together to discuss the case and strategy.  Due to the overwhelming evidence of guilt, the attorneys believed that it was in the best interests of their clients to plead guilty.  The attorneys believed that, if their clients pleaded guilty before the District Attorney filed the Notice of Intent, they could argue that the prosecutor was

---

[17] Wilson offers no explanation for this.

[18] Only one of the letters – a letter Wilson sent to his father dated November 28, 1979 – was admitted into evidence at the hearing (ECF No. 148-1 at 70), but the court's decision denying the motion to withdraw suggests that the court considered more than one letter (ECF No. 149-2 at 3).  The letters are in this court's record as Wilson's exhibits 54, 56, 57, and 59 at Docket #53.

precluded from seeking the death penalty because he had not provided notice
prior to the guilty pleas.  According to two of the attorneys, they did not really
believe that the lack of notice was a valid argument; however, they felt that it
would at least create an appellate issue should the proceedings be free of error.
Appellant Wilson now seeks to use the precise issue that the attorneys created to
contend that he did not understand the consequences of his plea because he
believed that he could not be sentenced to death since he pleaded guilty prior to
the filing of the Notice of Intent.  This contention is without factual support.

On numerous occasions, the lower court asked Wilson if he understood
that he could be sentenced to death.  Each time Wilson responded that he
understood that fact.  Wilson was informed that the District Attorney would be
seeking the death penalty and that he would be attempting to prove various
aggravating circumstances so that the death sentence could be imposed. On
several occasions, Wilson stated that he understood that he could be sentenced to
death, but he still wanted to plead guilty.  Finally, Wilson stated that he
understood that if the three judge panel did impose the death penalty there was no
appeal by virtue of his guilty plea.  In light of the thorough canvassing of Wilson,
there is no doubt that he understood that he could be sentenced to death.
Accordingly, we also find that Wilson's plea was freely and voluntarily entered.

*Wilson I*, 664 P.2d at 329-34.

There is no reason to not defer to the Nevada Supreme Court's determination that

Wilson's guilty plea was not the product of deception.  And, while the court did not specifically

address Wilson's claim of undue coercion, the mostly uncontradicted testimony of Brennan and

the other defense attorneys establishes that they were forceful in expressing their professional

judgment, but did not make threats or improper promises that caused Wilson to plead guilty

involuntarily.  Before accepting Wilson's pleas, Judge Breen had Wilson confirm several times

that he was pleading guilty voluntarily and not due to threats, promises, or coercion. ECF No.

145-1.

In addition, Wilson has not shown that Brennan's conduct in advising him to plead guilty

constituted ineffective assistance of counsel.  Shortly after he was retained, Brennan was advised

by the district attorney that he was unwilling to enter a plea bargain that would remove the death

penalty as a possible sentence. ECF No. 148-1 at 141.  With the evidence against Wilson

overwhelming, Brennan reasonably determined that Wilson stood a better chance of avoiding the

death penalty if entered a guilty plea so that he could be sentenced by a three-judge panel rather

than a jury. *Id*. at 144.  He was also faced with the likelihood that other defendants would enter

19

guilty pleas and provide testimony that placed the blame on his client.  Those were the primary reasons for advising Wilson to enter a guilty plea.  The notice of intent issue affected the only the timing of the guilty plea.

          2.  Inadequate plea canvass

     Wilson claims the trial court's plea canvass was constitutionally defective because, during the canvass, he denied culpability by asserting that the killing was self-defense.  He also argues that, in entering his guilty plea to first-degree murder, he never acknowledged the murder was deliberate and premeditated, only that it was committed in the course of a robbery.

     Early in the canvass, the following exchange took place:

     THE COURT: Well, okay.  The crime is murder.  One of the elements is premeditation of this offense.

     Do you know what that means?

     WILSON: Yes, your Honor.

     THE COURT: What is that?

     WILSON: We preplanned it.

     THE COURT: The specific intent to kill somebody; right?

     WILSON: Yes.

     THE COURT: Mr. Brennan, would you make a statement about the elements of this offense, what you explained to your client?

     MR. BRENNAN: Yes, your honor. I explained to him that the State would have to prove beyond a reasonable doubt, as you have explained to him also, in front of a jury, that in Washoe County, at the place alleged, which was near Idlewild Park, on June the 25th, that Wilson, with the assistance or help of the other three defendants, during the course of an attempted robbery or robbery of Officer James Hoff, who was a Reno police officer and a human being, killed him by stabbing him to death with knives.

     THE COURT: Is that the way you understand it?

     DEFENDANT WILSON: Yes, your Honor.

     THE COURT: You are clear on that?

     DEFENDANT WILSON: Yes.

     THE COURT: Are you guilty of this offense?

DEFENDANT WILSON: Yes, your Honor.

ECF No. 145-1 at 11-12.

The court went over various defenses and asked Wilson if any of them might apply to him. Wilson responded: "[I]n a way it was self-defense . . . because I was jumped during the crime. I was threatened to be killed." *Id*. at 13. Asked by the court to explain, Wilson claimed Hoff grabbed him around the neck and threatened to kill him before the other three defendants stabbed Hoff. *Id*.

Later in the hearing, the district attorney (Cal Dunlap) sought to ensure that Wilson was entering a plea to a deliberate and premeditated murder, in addition to felony murder:

> MR. DUNLAP: Your Honor, while we are on that subject, if I might, I would also note that in the Indictment, in addition to the controversy that we just argued about, there is an allegation that the killing was deliberately planned and done with premeditation, which is an addition to the felony murder allegations, and that by pleading guilty, they are likewise admitting to a prior plan and deliberation and premeditation of the killing, which Mr. Wilson seems to say arose just because of Mr. Hoff, rather than a plan. It seems to me this morning at one phase he said that there was a plan, and at the other phase he said it just happened because of what Mr. Hoff and Mr. Lani did. I just want to make sure that he understands that he is also admitting to deliberately and premeditatingly killing this person.

> MR. BRENNAN: Your Honor, I have explained to him that premeditation and deliberation can be as quick as successive thoughts of the mind, which the jury instruction in our state says, and also, it would be our same position - - on that, we have no objection, that premeditation, deliberation.

> If counsel is talking about a plan to murder prior to going to the scene, it would be our same position as it was on the kidnapping.

*Id*. at 29-30.

Wilson was informed that premeditation and deliberation were elements of first-degree murder and that he was pleading guilty based on that theory. The fact that he did not personally confirm on the record that the murder was premeditated and deliberate does not render his plea invalid under the Constitution. Indeed, the trial court was not even required to explain those elements. *See Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) ("[W]e have never held that the judge must himself explain the elements of each charge to the defendant on the record.") The

1   trial court was permitted to rely on Brennan's representation that he had explained the elements

2   to Wilson. *Id.*  In addition, Wilson's statement that the other defendants stabbed Hoff after Hoff

3   had grabbed him around the neck and threatened to kill him is not necessarily inconsistent with

4   an admission that the murder was premeditated and deliberate.

5                   3.  Mental competence

6         Wilson claims his guilty pleas are invalid because he was not competent when he entered

7   them.  A criminal defendant may not plead guilty unless he does so competently. *Godinez v.*

8   *Moran*, 509 U.S. 389, 396 (1993).  To meet the competency standard to plead guilty, it must be

9   determined "whether the defendant has 'sufficient present ability to consult with his lawyer with

10  a reasonable degree of rational understanding' and has a 'rational as well as factual

11  understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. United States*, 362 U.S.

12  402, 402 (1960)); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been

13  accepted that a person whose mental condition is such that he lacks the capacity to understand

14  the nature and object of the proceedings against him, to consult with counsel, and to assist in

15  preparing his defense may not be subject to a trial.").

16        Here again, Wilson relies on the report prepared by Dr. Greenfield.  Based on an

17  evaluation conducted more 20 years after the fact, Dr. Greenfield determined that Wilson was

18  "confused, uncertain, frightened and fearful, exhausted, and otherwise impaired" at the time of

19  the plea hearing. Docket #60, Ex. 75, p. 10.  This falls well short of showing he did not meet the

20  competency standard.  In addition, the transcripts of Wilson's plea hearings support a finding

21  that he had a firm grasp of the proceedings against him and the consequences of his guilty pleas

22  and was capable of consulting with counsel and assisting in the preparation of his defense. ECF

23  No. 145-1.

24        Claim Two is denied.

25                   *Claim Four*

26        In Claim Four, Wilson alleges that his guilty plea to first-degree kidnaping is invalid

27

28                                          22

1   under the Constitution because it was not knowingly or voluntarily entered and was rendered

2   without an understanding of the facts as they related to the criminal statute.  He claims that

3   Brennan did not explain the elements of the crime to him before he entered his plea and the

4   prosecutor's theory of the crime did not constitute first-degree kidnaping.   He also claims that

5   the trial court's plea canvass was inadequate because it consisted of boilerplate questions without

6   an inquiry into Wilson's mental state.

7       Claim Four is without merit.  At the plea hearing, Judge Breen explained to Wilson that

8   the State would have to prove that he intentionally took or deprived a person of his or her liberty

9   with the use of force and inflicted "grave injury to the victim." ECF No. 145-1 at 70.  Wilson

10  confirmed that he understood these elements. *Id*. at 70-71.  Contrary to the allegation in Wilson's

11  petition, the State was not required to prove that bodily harm was inflicted "during the acts of

12  asportation or subsequent detention." ECF No. 134 at 108.  Instead, it was sufficient that

13  confining or moving Hoff increased the risk of harm to him. *See Langford v. State*, 600 P.2d 231,

14  236 (Nev. 1979); *Wright v. State*, 581 P.2d 442, 444 (Nev. 1978).

15      Also, unless he had reason to question Wilson's mental state, Judge Breen's obligation

16  was only to ensure that Wilson's plea was "voluntary" and a "knowing, intelligent act[] done

17  with sufficient awareness of the relevant circumstances and likely consequences." *Brady v.*

18  *United States*, 397 U.S. at 748.  Wilson points to no authority requiring the court to delve into his

19  mental state absent any indication that he was impaired. The transcript of the plea canvass shows

20  that Breen questioned Wilson extensively about the rights he was waiving, the elements of the

21  offense, and the consequences of entering a guilty plea. ECF No. 145-1 at 66-72.  There is

22  nothing to suggest that Wilson did not have full understanding of what he was pleading guilty to

23  and what the consequences would be.

24      Claim Four is denied.

25          *Claim Five*

26      In Claim Five, Wilson alleges that his guilty plea to first-degree kidnaping is invalid

27

28

23

under the Constitution because it was the product of ineffective assistance of counsel.  He claims that counsel knew, or should have known, that the State could not prove beyond a reasonable doubt that Wilson was guilty of kidnaping.  He contends that Brennan advised him to plead guilty without conducting an adequate investigation of the evidence.  He further claims that the primary evidence that supported the kidnaping charge – i.e., the testimony of John Dollar – would not have been admissible at trial.

Wilson entered his guilty plea to the kidnaping charge a week after entering his guilty pleas to first-degree murder and robbery. ECF No. 145-1 at 64-75.  In exchange for the plea, the prosecutor agreed to not argue in the penalty phase that the plea constituted a judicial admission and would instead try to prove kidnaping as aggravating circumstance by presenting evidence at the penalty hearing.  In addition, the prosecutor would recommend that any sentence imposed for the kidnaping would run concurrently with Wilson's other sentences.  It was also understood, however, that the trial court was not bound by the agreement and could give any legal effect it chose to Wilson's guilty plea.

As mentioned above, the kidnaping charge required the State to prove that Hoff was still alive when he was loaded in the back of the car.  In his statement to the police two days after the murder, Olausen said that Hoff had stopped breathing on the ground before being placed in the car. ECF No. 144-2 at 28.  He also said that, at the time, Lani had already run off and Stites had just left, saying he was going to look for Lani. *Id*. at 25-28.  He and Wilson then lifted Hoff into the car. *Id*. at 29.  Stites' statement to the police about six weeks after the murder was consistent with Olausen's statement in that he also said that Lani had run off and that he (Stites) took off walking prior to Hoff being loaded in the car. ECF No. 144-6 at 16-18.  He also said that he met up with Lani a short time later and that he responded "yes" when Lani asked if they had killed Hoff. *Id*.

Because he assisted Stites and Lani after the murder, Dollar was charged with two counts of being an accessory after the fact. ECF No. 144-3 at 116.  Prior to his testimony before the

grand jury, he entered into a plea bargain that provided for his release on his own recognizance in exchange for his testimony. *Id*. at 118. His grand jury testimony included the following exchange:

> [DUNLAP]: Okay. Now with regard to Fred G. Stites and David W. Lani, did either of them tell you anything about the condition of the officer after the stabbing took place and when they moved him to the vehicle?
>
> [DOLLAR]: Well, when they moved him to the vehicle, he was still moaning, asking – just moaning. That is all he could get out. He was almost dead, and then –
>
> [DUNLAP]: Okay. Who told you about that?
>
> [DOLLAR]: I believe Dave brought it up first, and then they both sooner or later mentioned it. I am not certain which one.
>
> [DUNLAP]: Was that in the presence of each other?
>
> [DOLLAR]: Yes, sir.
>
> . . .
>
> [DUNLAP]: Well would you tell me where this moaning took place? Was this while they were moving him and when he was in the vehicle?
>
> [DOLLAR]: When he was in the vehicle. They had trouble getting him in. They bounced him around quite a bit, and they ran from the other car.

ECF No. 144-3 at 137-38.

At the hearing on Olausen and Wilson's motions to withdraw their guilty pleas, Brennan testified that, in his opinion, the kidnaping count was the weakest count in the indictment. ECF No. 148-1 at 125. He further testified that "what we're hoping for is the kidnap charge could run concurrent with a murder charge." *Id*. At the evidentiary hearing on Wilson and Olausen's state post-conviction petitions, Brennan testified that he relied on Dollar's testimony to determine that the State had sufficient evidence to convict Wilson of kidnaping and that he could not recall whether there was any there was any direct evidence or testimony provided by the defendants that would support the charge. ECF No. 151-1 at 99-101. He also testified that he could not remember whether Wilson told him whether Hoff was dead or alive when he was placed in the car. *Id*. at 109.

25

1    Based on the record before it, this court concludes that Brennan performed below the

2  *Strickland* standard in advising Wilson to enter a guilty plea to first-degree kidnaping.  To begin

3  with, Brennan's reliance on Dollar's grand jury testimony was objectively unreasonable.  That

4  testimony was ambiguous as to who, as between and Lani and Stites, told him what about Hoff

5  moaning and when the moaning supposedly occurred.  When he later testified at the penalty

6  hearing, Dollar proved to be an unreliable witness.  According to his testimony at the penalty

7  hearing, Stites took off after stabbing Hoff, but Lani came back to the scene of the crime and

8  helped load Hoff in the car. ECF No. 146-1 at 5, 11-13.  That conflicted with the statements of

9  both Olausen and Stites, neither of whom would have reason to be untruthful about Lani's

10  absence, and no other evidence in the record indicates that Lani was present when Hoff was

11  loaded in the car.[19]  At a minimum, Brennan should have determined whether Dollar could

12  provide reliable testimony before advising Wilson to plead guilty to kidnaping.

13    In addition, there was other evidence available to Brennan at the time that would have

14  significantly undermined the State's case in support of the charge.  If Brennan had interviewed

15  Dr. Gauthier, he would have learned that determining the time of Hoff's death was highly

16  speculative and that it could have been as soon as five minutes after being stabbed, which would

17  have supported a reasonable doubt that Hoff was still alive when he was loaded into the car.

18  Officer Eubanks testified at the penalty hearing that there was a "very large puddle of blood" at

19  the scene.  ECF No. 145-3 at 53.  Dr. Llewellyn testified in post-conviction proceedings that the

20  Hoff "exsanguinated right in the field."  ECF No. 151 at 45.  The State's theory that stab holes in

21  the sheet suggested that Hoff was still alive was also challengeable.  The information available to

22  Brennan at the time indicated that Hoff was either dead or very close to being dead when Wilson

23  and Olausen put him in the car.  Brennan was also aware that the sheet could not have been

24  placed on Hoff until after Wilson and Olausen had returned to the El Tavern and retrieved the

25

---

[19] The court also notes that the three-judge panel did not find kidnaping to be an aggravating circumstance

26  with respect to Lani, which suggests that the panel did not accept Dollar's testimony as accurate on this point.

27

28

sheet from the motel room.[20]  In addition, Stites had told police the stab holes were from Lani

playing with knives in the motel room, providing Brennan with an alternative explanation for the

holes. ECF No. 144-6 at 45-47.  In post-conviction proceedings, Olausen's counsel effectively

demonstrated that Dr. Gauthier was wrong in suggesting that holes in the sheet matched Hoff's

wounds. ECF No. 152-1 at 22-51.

Notwithstanding the lack of evidence supporting the kidnaping charge, Brennan's advice

may have been reasonable if the guilty plea to kidnaping had provided Wilson a significant

benefit, but it did not.  Wilson had already entered his guilty pleas to first-degree murder and

robbery.  A concurrent sentence on the kidnaping charge stood a chance of shortening his

ultimate length of custody only in the very unlikely event that his forthcoming sentence on the

murder charge allowed for the possibility of parole.  The district attorney's promise to not argue

that the plea was a judicial admission to an aggravating circumstance was largely illusory given

that the court was nonetheless free to view it as such.  By entering a guilty plea to kidnaping,

Wilson provided an aggravating circumstance for the State but received little, if any, benefit in

exchange.

In addition to finding that Brennan's performance fell below the *Strickland* standard, the

court also concludes that prejudice prong is met as well.  That is, there is a reasonable probability

that Wilson would have insisted on going to trial on the kidnaping charge if Brennan had

conducted an adequate investigation and provided Wilson with a more-informed assessment of

his chances of prevailing on the charge.  Respondents argue that, had Wilson chose to go to trial,

Lani and/or Stites would have been willing to testify against Wilson to improve their position.  If

so, however, both could have been impeached with evidence that they were not physically in a

---

[20] Lani would later testify at the penalty hearing that the sheet was not placed on Hoff until he and Stites
had returned to the El Tavern, which would have further extended the length of time given that Stites
traveled on foot from the scene of the stabbings to the motel. ECF 146-1 at 175-77, 211-13.  According to
his testimony, Lani ran to his nearby apartment after stabbing Hoff, retrieved a bicycle, and then
happened to meet Stites on the bridge at the end of Idlewild park, approximately a mile from the scene of
the stabbing.  After he and Stites returned to the El Tavern, he went with Olausen and Wilson to hide
Hoff's body in Verdi while Stites remained at the motel.  This testimony is consistent with Stites'
statement to the police and is not significantly contradicted by any other evidence in the record.

1    position to hear or see whether Hoff was alive inside the car.  Lani's first contact with Hoff's

2    body after the initial stabbing was not until he had returned to the El Tavern, well beyond the

3    time Hoff could have survived.  Likewise, Stites could have been impeached with his statement

4    to the police that he also left the scene before Hoff was loaded in the car.

5        Because it was the product of ineffective assistance of counsel, Wilson's conviction on

6    the charge of kidnaping with use of a deadly weapon is unconstitutional.  However, Wilson's

7    sentence for that conviction runs concurrent to his first-degree murder sentence, so habeas relief

8    would have no effect on his term of confinement.  Consequently, this court chooses to exercise

9    its discretion under the concurrent sentence doctrine and declines to grant relief as to the

10   kidnaping conviction. *See, e.g., Benton v. Maryland*, 395 U.S. 784, 787-91 (1969); *Van Geldern*

11   *v. Field*, 498 F.2d 400, 401–02 (9th Cir. 1974) (discussing application of the doctrine on federal

12   habeas review of state convictions).

13       In addition, invalidation of the kidnaping conviction does not perforce mean that Wilson

14   is entitled to relief with respect to the death penalty.  For one, the Nevada Supreme Court

15   concluded that the State had presented sufficient evidence at the penalty hearing, independent of

16   Wilson's guilty plea, to support kidnaping as an aggravating circumstance. *Wilson I*, 664 P.2d at

17   335-36.

18       Secondly, even if the sentencer has considered a subsequently invalidated aggravating

19   circumstance at the penalty phase, a federal habeas court must, before granting relief, "conduct a

20   separate harmless error analysis pursuant to *Brecht* [*v. Abrahamson*, 507 U.S. 619, 638 (1993),]

21   in order to determine whether the error had a substantial and injurious effect on the jury's

22   verdict." *Beardslee v. Brown*, 393 F.3d 1032, 1037 (9th Cir. 2004).  This inquiry requires a

23   "careful examination of the penalty phase transcript and the verdict itself" to assess whether the

24   invalid aggravating circumstance "play[ed] a significant role in the penalty phase jury's

25   decision." *Id*. at 1041.

26       In addition to finding that the murder was committed while engaged in the commission of

27

28                                      28

1    a kidnaping, the three-judge panel found two other aggravating circumstances: (1) the murder

2    was committed while Wilson was engaged in a robbery and (2) the murder was committed for

3    the purpose of receiving money. ECF No. 147-3.  As a mitigating circumstance, the panel found

4    only that Wilson "was twenty years of age at the time of the commission of the crime." *Id*. at 5.

5    Citing a similar robbery attempt in Sacramento, California,[21] the panel choose to not find as a

6    mitigating circumstance that Wilson had no significant history of prior criminal activity. *Id*.

7    Even without the aggravating circumstance based on kidnaping, the panel would not have found

8    that mitigating circumstances outweighed aggravating circumstances.  So, the kidnaping

9    aggravator was not necessary to establish Wilson's eligibility for the death penalty. *See* Nev.

10   Rev. Stat. § 175.554.

11        In concluding that Wilson and Olausen's death sentences were "not disproportionate to

12   the penalty imposed in similar cases" nor "imposed under the influence of passion, prejudice or

13   other arbitrary factor," the Nevada Supreme Court noted the following:

14        Appellants, along with two other young men, carried out an elaborate,
     preplanned plot to kill a drug dealer for $16,000.00.  The drug dealer was actually

15   Reno police officer James Hoff, who was conducting an undercover investigation.
     Wilson, the apparent ringleader of the group, brought Hoff to the scene of his

16   death where the other three were lying in wait.  Hoff was stabbed a total of nine
     times.  There was evidence that Hoff begged for his life after the first wounds

17   were inflicted.  A medical expert testified that Hoff might have lived as long as
     twenty minutes after the attack before dying of massive bleeding.

18
          Hoff's body was placed in the back of his Datsun 280Z and taken to a

19   remote area in Verdi, where he was buried in a shallow grave.  His fellow officers
     located the body the next day after a massive search effort.

20

21   *Wilson v. State*, 705 P.2d 151, 152-53 (Nev. 1985) (*Wilson II*) (footnote omitted).

22        Notably, the Nevada Supreme Court did not mention the lower court's finding that Hoff

23   had been kidnaped as a reason for concluding that the death penalty was warranted.  Given Dr.

24   ---

25   [21] The State presented the testimony of Troy Russo, who testified that Wilson made arrangements with
     him to buy a car from a third party and that he (Russo) gathered the money for the purchase. ECF No.

26   146-1 at 116-23.  According to Russo's testimony, Wilson drove Russo to a park late at night where
     Wilson parked, left the car temporarily to supposedly go to the bathroom, and returned with another

27   individual who was carrying a shotgun. *Id*.  Russo testified that he fled to a nearby home and called the
     police. *Id*.

28

1   Gauthier's testimony that Hoff could not have survived more than 20 minutes, the fact that he

2   may have still been alive when placed in the back of the car did not add significant weight in

3   favor of the death penalty.  Without question, the brutal manner in which Hoff was killed and the

4   fact that it was done for money were far more compelling reasons to impose the death sentence

5   than a finding that he had been kidnaped.

6          The record contains additional aggravating facts not specifically mentioned by the

7   Nevada Supreme Court.  At his plea hearing, Wilson admitted that he "started the whole thing"

8   and "was the first one to get everything going." ECF No. 145-1 at 12-13.  Lani testified that he,

9   Olausen, and Stites were leaning toward aborting the plan, but Wilson insisted that it was too late

10  for them to back out. ECF No. 146-1 at 166-69.  The three-judge panel found that the Lani and

11  Stites acted under the Wilson's dominion. ECF No. 147-3 at 4.  On the other side of the scale,

12  the three-judge panel was presented with virtually no mitigating evidence with respect to Wilson,

13  other than his age at the time of the crime.[22]  And, while it found that Stites and Lani had

14  demonstrated some remorse for their involvement in Hoff's death, the panel made no such

15  finding with respect to Wilson. *Id*.

16         In sum, the record supports a conclusion that the inclusion of the aggravating

17  circumstance based on kidnaping did not play a significant role in the three-judge panel's

18  decision to impose the death penalty.  Thus, Wilson is not entitled to habeas relief based on

19  Claim Five.[23]

20             *Claim Six*

21         In Claim Six, Wilson alleges that his death sentence is invalid under the Constitution due

22  to the involuntary, unknowing, and unintelligent nature of his guilty plea to robbery.  He claims

23  he pled guilty to robbery without being adequately informed of the elements of the crime by

24  ─────────────────────

25  [22] Wilson's claim that counsel was ineffective by failing to develop mitigating evidence (Claim Nine) is
    addressed below.

26

27  [23] Because the court is not granting relief, the court declines to address whether the state court's
    adjudication of this claim is worthy of deference under § 2254(d).

28

either his trial counsel or the trial court.  According to Wilson, the transcript of the plea canvass shows he entered the plea under the misconception that robbery was merely taking something from somebody else even if the person was dead.

This claim is without merit.  Both Wilson and Brennan confirmed during the plea canvass that they had discussed the nature of the crime of robbery. ECF No. 145-1 at 17.  As noted above, the trial court was permitted to rely on this representation and not required to independently review the elements before accepting Wilson's guilty plea. *See Bradshaw*, 545 U.S. at 183.  At one point, the following exchange occurred:

> THE COURT: What were you doing at the time, you and the others?
>
> DEFENDANT WILSON:  Well, the robbery took place not until after he was dead.
>
> THE COURT:  Had you planned on robbing him?
>
> DEFENDANT WILSON:  Well, we didn't know really what we were going to do.  At first, we intended that, but, you know, I don't think it ever would have happened if Officer Hoff wouldn't have grabbed Mr. Lani.

ECF No. 145-1 at 15.

Later in the hearing, the district attorney asked that the court confirm that Wilson understood that that he was admitting "that there was at least the beginning of the robbery taking place during the assault upon Mr. Hoff and that the death of Mr. Hoff before the actual taking of the money does not constitute a defense." *Id*. at 31.  Wilson stated that he understood the statement. *Id*.

In fact, intent to take property from a living person is not an element of robbery under Nevada law. *See Leonard v. State*, 969 P.2d 288, 296 (Nev. 1998), *cert. denied*, 528 U.S. 828 (1999).  Under Nevada's robbery statute, "it is irrelevant when the intent to steal the property is formed," and it is not necessary that the force or violence involved in the robbery "be committed with the specific intent to commit robbery." *Chappell v. State*, 972 P.2d 838, 841 (Nev. 1998), *cert. denied*, 528 U.S. 853 (1999).  Instead, a robbery exists where a defendant simply takes

31

1    "'advantage of the terrifying situation [he or she] created'" and flees with the victim's property.

2    *Id*. (quoting *Norman v. Sheriff*, 558 P.2d 541, 542–43 (Nev. 1976)).  The record demonstrates

3    that Wilson was adequately informed of the elements of robbery prior to entering his guilty plea.

4         Claim Six is denied.

5              *Claim Eight*

6         In Claim Eight, Wilson alleges that this conviction and death sentence are invalid under

7    the Constitution due to a conflict of interest arising from his counsel's prior representation of a

8    key prosecution witness.  Brennan had previously represented James McCall in a case in which

9    McCall was charged with kidnaping with use of a deadly weapon, possession of heroin,

10   extortion, and other crimes. ECF No. 146-1 at 92.  Wilson contends that Brennan placed

11   McCall's interests above his and that, but for the conflict, Brennan could have cross-examined

12   McCall more effectively.

13        Unless the trial court neglects its duty to inquire into a potential conflict brought to its

14   attention, a defendant must demonstrate that "a conflict of interest actually affected the adequacy

15   of his representation." *Cuyler v. Sullivan*, 446 U.S.335, 348–349 (1980).  He must demonstrate

16   an actual conflict of interest, which is "a conflict that *affected counsel's performance*—as

17   opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)

18   (emphasis in original).  The Ninth Circuit has held that "[i]t is clearly established by Supreme

19   Court precedent that 'successive representation' may pose an actual conflict of interest because it

20   may have an adverse [e]ffect on counsel's performance." *Alberni v. McDaniel*, 458 F.3d 860,

21   872, 874 (9th Cir. 2006) (citing *Mickens*, 535 U.S. at 175–76).  Even so, a habeas petitioner must

22   demonstrate that any conflict arising from counsel's prior representation "significantly affected

23   counsel's performance." *Rowland v. Chappell*, 876 F.3d 1174, 1193 (9th Cir. 2017) (quoting

24   *Mickens*, 535 U.S. at 172–73).

25        When the State called McCall as a witness at the penalty hearing, Brennan notified the

26   court that he had represented McCall in the prior case and that, although he had information that

27

28
                                    32

1    would benefit Wilson, he was not ethically permitted to cross-examine McCall. ECF No. 146-1

2    at 92-93.  The court then granted a recess to allow the prosecutor to confer with McCall's new

3    attorney. *Id*.  After the recess, the prosecutor advised the court that McCall would waive the

4    attorney-client privilege and allow Brennan to fully cross-examine McCall on matters that would

5    otherwise fall under the privilege, with the understanding that the State would not use the

6    information against McCall in any pending case or any case in which McCall had already been

7    convicted. *Id*. at 94.

8         McCall testified that he was housed in the same unit of the Washoe County jail as

9    Olausen. *Id*. at 96.  On direct examination, he testified about details surrounding the murder that

10   Olausen had told him and other inmates, which included Hoff begging for his life after the initial

11   stabbing by Lani and Olausen stabbing Hoff in the stomach and mouth to get Hoff to shut up. *Id*.

12   at 98-99.  He also testified that Olausen seemed excited, "almost like a person who gets their first

13   car," when discussing the killing. *Id*. at 98.  With respect to Wilson, McCall testified that he met

14   him in a holding area while waiting to go to court, along with two other people. *Id*. at 99-100.

15   According to McCall's testimony, Wilson told another prisoner that he was in jail for the Hoff

16   case, that it was "a bum beef" because it was self -defense, and that he was going to hire F. Lee

17   Bailey. *Id*. at 100.  McCall also testified that Wilson was arrogant. *Id*.

18        Brennan began his cross-examination of McCall by establishing that a doctor had

19   determined that McCall had "the IQ of a kindergartener" and recommended that he be sent to

20   Lake's Crossing,[24] where McCall stayed on and off for about half a year. *Id*. at 101.  He then

21   impeached McCall's prior statement that he came forward because he did not want to see anyone

22   hurt and did not like to hurt anyone.  He did so by eliciting from McCall the facts of his kidnap

23   case.  Those facts included McCall and his friend ordering the victim into the trunk of a car at

24   gunpoint and driving the victim to a remote area out of town, where McCall, at one point, fired

25

26   ───────────────

[24] Lake's Crossing referred to Lake's Crossing Facility for the Mentally Disordered Offender.  The court,
while Brennan was representing McCall, sent McCall to the facility for a competency assessment. Docket

27   #52, Exhibit 30, p. 5-7.

28

the gun and allegedly told the victim he was going to kill him with an overdose of heroin if he did not cooperate. *Id*. at 102-05.  Brennan also got McCall to admit that he had lied to people about his parents owning *McCall's* magazine. *Id*. at 105.  Brennan concluded his cross-examination by placing McCall's psychological reports into evidence. *Id*. at 108-09.

To support his claim that Brennan placed McCall's interests over his, Wilson cites a point in the proceeding when Judge Breen suggested that Brennan "clear up this point of why [McCall] went to Lake's Crossing" and Brennan responded: "I can't.  That would be giving you evidence your Honor.  I don't know how I can clear that up by asking him." *Id*. at 107-08.  Rather than showing that Brennan was withholding impeaching information, as Wilson claims, Brennan was more likely advising the judge that he (Brennan) would be improperly testifying if he told him why McCall went to Lake's Crossing and that he did not know how to elicit the information by questioning McCall.  Wilson points to additional information that Brennan should have used to cross-examine McCall, but it is not information that would have been covered by the attorney-client privilege.

In sum, Brennan successfully challenged McCall's credibility with his cross-examination.  To the extent any conflict remained after McCall waiving the attorney-client privilege, Wilson cannot show that it significantly affected Brennan's performance.  Thus, Claim Eight is denied.

### Claim Nine

In Claim Nine, Wilson claims his conviction and sentence are invalid because he was deprived of his constitutional right to effective assistance of counsel in the penalty phase.  He contends effective counsel would have investigated and presented evidence about him being sexually molested as a young boy, the adverse circumstances of his childhood, and the impact his childhood had on his mental health.  He also claims that counsel failed to effectively investigate and cross-examine William Mendenhall.  In addition, Wilson alleges that competent counsel would have moved to sever his trial from that of the other defendants and would have more zealously acted in his best interests.

34

1            1.  9(A-D) – Mitigating evidence

2          At the hearing on Olausen and Wilson's motions to withdraw their guilty pleas, Brennan

3    testified that he talked with Wilson's family members (Wilson's father and a few of Wilson's

4    older siblings) about the possibility of testifying at the penalty hearing on Wilson's behalf. ECF

5    No. 148-1 at 158-59.  He told them he would like them to testify and thought Wilson's father, in

6    particular, would evoke a lot of sympathy, having raised ten or eleven kids working as a garage

7    mechanic. *Id*. at 159.  However, shortly before he was to testify, Wilson's father asked Brennan

8    whether he would be under oath and whether the prosecutor would be permitted to cross-

9    examine him. *Id*.  When Brennan told him that both would occur, Wilson's father said he was

10   afraid he would say things that would hurt, rather than help, Wilson's case and gave the example

11   of Wilson burglarizing his sister's home after she had bailed him out of jail and taken him into

12   her home. *Id*.  Concern that their testimony could be more negative than positive, Brennan

13   decided it was in Wilson's best interests that his family members not be called as witnesses at the

14   penalty hearing. *Id*. at 160.  The testimony of Wilson's father at the same hearing corroborates,

15   to some extent, Brennan's testimony. ECF No. 148-1 at 82-86.

16          Wilson presented a claim in his first state post-conviction proceeding alleging that

17   counsel was ineffective by failing to develop mitigating evidence.  At the evidentiary hearing on

18   the petition, Wilson called his brother and father as witnesses.  His brother, David Wilson,

19   testified that he was 11 months younger than Wilson and that they had six younger brothers and

20   three sisters. ECF No. 150-1 at 113-14.  Their parents separated when Wilson was 12 or 13. *Id*.

21   at 114.  For a two-year period when they were in the seventh and eighth grade, David and Wilson

22   worked after school, by themselves, at their father's gas station to help support the family, which

23   meant Wilson was not able to play sports or participate in school activities. *Id*. at 115-16.

24   Wilson resumed playing sports and participating in activities when he entered high school. *Id*. at

25   115.  He excelled in several sports, was elected campus king by the student body, was very

26   popular, and had a lot of girlfriends. *Id.* at 116-20.  He was also a solid B student, but could have

27

28

easily gotten As if he applied himself. *Id*. at 117-18.  Though Wilson stood up for David and protected him, he was not a violent person and David was shocked when he heard about the murder. *Id*. at 120-21.  Wilson did seasonal farm work while in high school, which allowed him to buy "nice things" like a home stereo and a car. *Id*. at 122-23.  Wilson was also on the school yearbook staff, a member of the athletic club, and the student council vice president for a year or two. *Id*. at 123.

As for meeting with Brennan, David testified that the family members met with him only one time for 15 to 30 minutes and that Brennan did not ask about Wilson's background information. *Id*. at 123-24.  David and the other family members assumed they would be testifying at the penalty hearing, but were not sure because Brennan never made that clear. *Id*. at 124-26.

Wilson's father's testimony with respect to Wilson's high school career, work history, and non-violent character was consistent with David's testimony. ECF No. 150-1 at 134-38. Elmer Wilson[25] also testified that Wilson "assumed the eldest son's kind of responsibilities in my place " when he and his wife separated, so Wilson had a lot more responsibilities than most kids his age. *Id*. at 135-36.  His testimony was also consistent with David's with regard to family members meeting briefly with Brennan and not being sure whether they were going to testify at the penalty hearing. *Id*. at 138-39.

Brennan also testified at the post-conviction hearing.  He testified that he could not recall ever checking into Wilson's background, but he did remember meeting with Wilson's family members. ECF No. 151-1 at 81-82.  After doing so, he decided that Wilson's father was going to testify that Wilson "had a difficult childhood, that he had come from a family with a lot of children in it, [with] a lot of poverty, shared clothes, and that kind of thing." *Id*. at 82.  The intent was to show that Wilson did not have "all of advantages" that "lots of children have when they

---

[25] Wilson's father is identified in the records as both Elmer and Edward.  For the sake of consistency and to avoid being confused with the petitioner, he is referred to as Elmer herein.

1    grow up." *Id*.  Consistent with his prior testimony, Brennan then recounted his reasons for

2    deciding not to call Wilson's father or other family members as witnesses. *Id*. at 82-83.

3         When recalled as a rebuttal witness, David Wilson testified that the reason he and his

4    brother had worked alone at the gas station was because their father was visiting his girlfriend in

5    another town, which was embarrassing in a small town and hard on the all the kids. ECF No.

6    151-1 at 210-11.  He also testified that Wilson's theft from his sister after bailing him out of jail

7    was a necklace and that Wilson gave it to his girlfriend.[26] *Id*. at 211-12.  Finally, he testified that,

8    when they were in the eighth or ninth grade after their father left home, a Catholic priest took an

9    interest in the Wilson family and took him and Wilson on a lot of trips. *Id*. at 213-14.  The priest

10   also occasionally took Wilson out for driving lessons. *Id*. at 214.

11        The Nevada Supreme Court adjudicated Wilson's claim based on counsel's failure to

12   develop mitigating evidence as follows:

13           Wilson argues that his counsel's failure to present certain mitigating
             evidence before the sentencing panel constituted ineffective assistance of counsel.
14           While counsel's efforts may have been less than heroic, the record on appeal
             indicates that his performance was within constitutional standards.
15
16           After meeting with Wilson's family before the penalty hearing, counsel
             decided not to have them testify.  He was afraid that their "mitigating" testimony
17           would do more harm than good.  Specifically, counsel was concerned that on
             cross-examination, Wilson's father or sister would have to discuss an incident
18           which occurred when Wilson was eighteen.  He was arrested in Sacramento, and
             his older sister posted his bail. Shortly afterwards, Wilson came to live with his
19           sister and stole a necklace.  He returned the necklace approximately one week
             later.

20           *Strickland* establishes a strong presumption that counsel's decisions were
             "sound trial strategy." 466 U.S. at 689, 104 S.Ct. at 2065.  Given counsel's
21           legitimate concerns that Wilson's own family might deliver damaging testimony,
             his decision not to call the family to testify did not vitiate Wilson's Sixth
22           Amendment right to counsel.

23           Prior to the penalty hearing, counsel made no effort to consult with people
             unrelated to Wilson, who might have been able to offer favorable testimony.
24           However, at the 1987 hearing for post-conviction relief, only Wilson's father and
             brother offered mitigating evidence in his behalf.  They described how Wilson
25           worked at his father's service station as a boy in order to assist the family during

26   _____

27   [26] The sister involved in the incident, also called as a rebuttal witness, testified that the necklace was
     returned a week later. ECF No. 151-1 at 224.

28

difficult financial times. As well, Wilson's brother described his prowess as a high school athlete and student leader.

It is clear that the limited amount of mitigating evidence offered by Wilson's father and brother at the hearing for post-conviction relief does not outweigh the aggravating circumstances present in his case. Although counsel may have been lax in not searching for more unrelated, but favorable witnesses for Wilson, we have no evidence that such a search would have been fruitful. Thus, unlike Olausen, Wilson suffered no prejudice by counsel's failure to present more mitigating evidence. Therefore, with respect to Wilson, the record on appeal does not support a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 687–695, 104 S.Ct. at 2064–2068.

*Wilson v. State*, 771 P.2d 583, 587–88 (Nev. 1989) (*Wilson III*).

As discussed in *Summerlin v. Schriro*, the Supreme Court has resisted implementing specific guidelines to assess an attorney's performance under *Strickland* and has focused instead on "prevailing professional norms." 427 F.3d 623, 629 (9th Cir. 2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). *Summerlin* makes clear, however, that, at the time of Wilson's trial, a criminal defense attorney in a capital case had "a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings." *Id*. at 630 (citing *Wiggins*, 539 U.S. at 521-23). And, while the reviewing court "must defer to a lawyer's strategic trial choices, those choices must have been made after counsel has conducted 'reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary.'" *Id*. (quoting *Strickland*, 466 U.S. at 691). In addition, "the investigation should include inquiries into social background and evidence of family abuse." *Id*. (citing *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir.2005)).

Here, the record demonstrates that Brennan failed to conduct any meaningful investigation into Wilson's family or personal history. Accordingly, his performance fell below prevailing professional norms. Wilson can satisfy the performance prong of the *Strickland* test in this regard, so the question then becomes whether he can also show prejudice. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. To prove prejudice, Wilson must demonstrate a reasonable probability that, but for counsel's failure to investigate, the result of his

1 trial would have been different. *See id.* at 694.

2      According to Wilson, Brennan should have uncovered and presented evidence that

3 Wilson was molested by two separate Catholic priests.  According to a report and subsequent

4 declaration provided by Vincent N. Schiraldi, MSW, who compiled a history of Wilson's

5 upbringing, a priest who ran the altar boy program at the local parish, sodomized Wilson on

6 several occasions when Wilson was six years old. Docket #53, Exhibits 51 and 72.  Schiraldi

7 also reports that, when Wilson was 12 years old, the priest that befriended the Wilson family

8 engaged in sexual contact with Wilson and his brothers (mostly Wilson) when he took them on

9 trips. *Id*.  Schiraldi's account of the earlier molestation, which appears to be based on his

10 interview with Wilson, is not supported with additional evidence, while the later molestation is

11 corroborated with a declaration from priest in question. *Id*., Exhibit 52.

12      Wilson also claims that Brennan should have interviewed family members and friends

13 who could have provided information about Wilson's troubled childhood.  According to Wilson,

14 they could have testified about Wilson having to endure poverty, family dysfunction, physical

15 and emotional abuse, and alcohol and substance abuse.[27]  In addition, Wilson contends Brennan

16 should have retained an expert to testify about how the adverse conditions of Wilson's childhood

17 impacted his mental well-being.  As support, he again cites to the report and declaration from

18 Schiraldi. Docket #53, Exhibits 51 and 72.

19      The problem for Wilson is that he did not attempt to present any of this evidence to the

20 state court until he filed his procedurally-barred second and subsequent state post-conviction

21 petitions.  While David Wilson testified in the initial post-conviction proceeding about the priest

22 taking him and Wilson on trips, he never mentioned molestation.  In fact, David characterized

23 the priest as "a very nice man." ECF No. 151-1 at 214.  Wilson could have testified about the

24 sexual abuse in post-conviction proceedings, but did not.  David and Elmer Wilson's post-

---

26 [27] Wilson has submitted written statements from some of these potential witnesses.  For most of them, however, he cites to interviews conducted by Schiraldi, Thomas Casler, and Brenda Bentley without provide any record of the interviews. ECF No. 134 at 82-87.

conviction testimony touched on some of the hardships Wilson endured, but for the most part, portrayed Wilson as a well-adjusted and popular teenager, who participated in several school activities and excelled in athletics.  Without discounting the trauma Wilson endured as a result of sexual abuse and family dysfunction, this court is not permitted, as discussed in Section III., to consider evidence that Wilson did not give the state court the opportunity to consider when it adjudicated his IAC claim.  And, because the state court reasonably applied the *Strickland* prejudice standard in denying relief, this court cannot grant relief based on counsel's failure to develop and present mitigating evidence.

           2.  9(E) – Investigation and cross-examination of William Mendenhall

William Mendenhall testified about conversations he had with Fred Stites when they were both in the Washoe County jail.  According to Mendenhall's testimony on direct examination, Stites told him that Wilson was the ringleader in the killing of Hoff. ECF No. 146-1 at 68.  Stites also said that Wilson had suggested to him that he had "ties to the underworld" by "pushing drugs on him" and telling him that "he could have anybody snuffed at any time wanted to." *Id* at 69.   Though not brought up on direct examination or mentioned in the two prior statements he had provided the district attorney,[28] Mendenhall also testified that Stites told him the defendants knew before the killing that Hoff was a police officer.  *Id*. at 77, 78-79.

Wilson contends that, had Brennan investigated Mendenhall's criminal background, he would have discovered that Mendenhall had been convicted in California of kidnaping, four separate non-felony theft charges, and an escape charge.  He would have also found that, three months after being paroled in California, Mendenhall was arrested in Washoe County for forgery and, days after being released on bail on that charge, embezzled $4,900 from a casino. Mendenhall subsequently jumped bail, was arrested in California, and returned to Nevada to face four felony charges.  In addition, he was also wanted in Texas for car theft.

Wilson further alleges that Mendenhall told the authorities in his initial statement that he

---

[28] Mendenhall's statements are Exhibits 38 and 39 at docket #52.

came forward because he had turned his life over to God and become a Christian, but shortly after providing that statement, he was sentenced to five years on probation and released.  In addition, the day after sentencing, Mendenhall gave another statement to the prosecution in which he revised the date of his conversation with Stites to a date prior to the date on which Stites gave his un-counseled statement to the police.  Finally, Wilson faults Brennan for not pointing out inconsistencies between Mendenall's statement to authorities and his penalty hearing testimony and for not inquiring whether Mendenhall had been promised anything by the prosecutor in exchange for his testimony.

Much of the information Wilson faults Brennan for not eliciting was provided to the three-judge panel at the penalty hearing.  Mendenhall testified, on direct examination, that he currently resided in the state prison, that he had been sentenced to five years for forgery, and that he also had felony convictions for kidnaping and escape. *Id*. at 67.  On cross-examination, he testified that he had too many misdemeanors for him to name them all. *Id*. at 70.  The three-judge panel also learned that, between the time of his first statement and his second, Mendenhall was released from custody. *Id*.  Mendenhall was also forced to admit that, despite giving a very detailed statement to the authorities about what Stites had told him, he did not mention anything about Stites knowing prior to the murder that Hoff was a police officer. *Id*. at 85-86.

This court is not convinced that there is reasonable probability that Wilson would not have received the death sentence if Brennan had made a greater effort to investigate and cross-examine Mendenhall.  The three-judge panel was made aware that Mendenhall had been convicted of multiple felonies, including a crime involving fraud.  In addition, the panel was presumably sophisticated enough to be suspicious of Mendenhall's claim of having found religion and would have at least suspected a connection between Mendenhall coming forward with helpful information and his subsequent release from custody.  As for Brennan's alleged failure to point out inconsistencies between Mendenhall's statements and his penalty hearing testimony, Wilson fails to identify any beyond those that were brought out on cross-examination

41

by Brennan and the other attorneys.  Finally, Mendenhall's testimony was not particularly

damaging.  Ample evidence from other sources established that Wilson was the "ringleader."

And, given evidence that, at the time of his arrest, Wilson was a twenty-year-old chronically

moving from one low-wage job to the next, the idea that he had "ties to the underworld" who

could have someone "snuffed" at any time was ridiculous.  Evidence that Wilson knew before

the killing that Hoff was a police officer would have added to the State's case, but Mendenhall's

failure to mention it until cross-examination after being interviewed twice by the authorities

lessened the impact of his testimony on that point.

Wilson has not established that counsel's failure to adequately investigate and cross-

examine Mendenhall resulted in *Strickland*-level prejudice.

### 3.  9(F) – Motion to sever

Wilson alleges that competent counsel would have moved to sever his penalty hearing

from that of the other defendants.  He contends that the damaging testimony of Mendenhall and

Dollar would have been inadmissible hearsay if he had been tried separately and counsel had

objected.

At the hearing on Olausen and Wilson's motions to withdraw their guilty pleas, Brennan

testified that he was concerned that, in a separate trial, the other defendants could be called as

witnesses against Wilson. ECF No. 148-1 at 160-61.  Confronted with that possibility, Brennan

decided it was in Wilson's best interest "to put up as much of a united front as we possibly

could." *Id*. at 161.

This was a reasonable choice considering the likelihood that the other defendants would

testify against Wilson in order to obtain more favorable outcomes for themselves.  And, for

reasons discussed herein, the penalty hearing testimony of Mendenhall and Dollar was not as

damaging as Wilson claims.  The in-person testimony of one or more of the other defendants at a

separate trial had the potential to be far more harmful.  This court concludes that counsel made a

reasonable strategic decision in not seeking a separate penalty hearing.  Such decisions cannot

42

1    support a claim of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690; *Mickey v.*

2    *Ayers*, 606 F.3d 1223, 1238–39 (9th Cir. 2010).

3                          4. 9(G) – Client's best interests

4            Wilson alleges that Brennan failed to act in his best interests throughout the proceedings

5    against him.  He repeats his claim that Brennan should have moved to sever his trial.  That

6    allegation has already been addressed.  He also faults Brennan for not making an opening

7    statement and for making an ineffective closing statement.

8            Of the four defense counsel, only Stites' attorney (Michael Specchio) gave an opening

9    statement.  ECF No. 145-3 at 19-21.  Additional opening statements from other attorneys would

10   have likely been repetitive, especially with respect to Brennan who had no mitigating evidence to

11   present.  Also, a three-judge panel, as opposed to a jury, was not likely to have been swayed by

12   an opening statement.

13           As for the closing statement, Brennan, the last attorney to argue, began his remarks by

14   noting that his much of his argument would be repetitive of what the other attorneys had argued.

15   ECF No. 147-1 at 43.  He then admitted that Wilson had orchestrated parts of his co-defendants

16   actions but pointed out that they were willing participants and not forced by Wilson into

17   committing the crimes. *Id*. at 44.  Brennan conceded that the murder occurred in the course of a

18   robbery, but then argued at length why remaining alleged aggravating circumstances did not

19   apply. *Id*. at 45-50.  He also asked the panel to not hold against Wilson the fact that, unlike other

20   defendants, Wilson did not give the police a statement. *Id*. at 50-51.  Brennan argued youth and

21   lack of a significant criminal history as mitigating circumstances. *Id*. at 51-52.  Finally, Brennan

22   told the panel that it was his decision (not Wilson's) that Wilson not take the stand, that Wilson

23   was capable of being rehabilitated, and that he did not have Wilson's family members testify

24   because he did not want to put them in the position of having to beg for Wilson's life. *Id*. at 52.

25           While it may have included a few ill-advised comments, Brennan's closing argument fell

26   within the range of competence demanded of attorneys in criminal proceedings.  In addition,

27

28
                                                    43

1   there is not a reasonable probability that a more eloquent or forceful argument would have

2   persuaded the three-judge panel to render a different verdict.

3        Claim Nine is denied.

4               *Claim Twelve*

5        In Claim Twelve, Wilson alleges that he was deprived of his constitutional right to

6   present mitigating evidence due to ineffective assistance of counsel and prosecutorial

7   misconduct.  As in Claim One(A), Wilson claims that effective counsel would have uncovered

8   and presented evidence that a man known as "Bud" conceived the scheme that resulted in Hoff

9   being killed and that Bud told Wilson specifically what he should do.  This claims fails for the

10  same reason Claim One(A) fails – i.e., Wilson has not presented evidence to substantiate his

11  claim that Bud was somehow responsible for his conduct.

12       Wilson further claims that the prosecution wrongfully withheld evidence it possessed

13  regarding Bud's role in the homicide, including statements to the police.  The only evidence

14  Wilson proffers to support this claim is a declaration from Herbert V. Ela, who identifies himself

15  as Bud's cousin and states that they lived together in the same room at the Reef Hotel for about a

16  month. Docket #50, Exhibit 9.  According to Ela's declaration, the police questioned Bud for

17  about 15 minutes at the hotel, then "took him downtown."

18       To establish a violation of his constitutional rights, Wilson must show that the

19  prosecution withheld evidence favorable to him and that there is reasonable probability that, had

20  the evidence been disclosed, the result of the proceeding would have been different. *See Banks v.*

21  *Dretke*, 540 U.S. 668, 691  (2004) (discussing *Brady v. Maryland*, 373 U.S. 83 (1963)).  Even if

22  the police did question Bud, Wilson has made no showing that any information obtained from

23  Bud was favorable to Wilson, much less weighty enough to have any effect on the outcome of

24  his trial.

25       Claim Twelve is denied.

26  \ \ \

27

28                    44

1              *Claim Thirteen*

2              In Claim Thirteen, Wilson alleges that his conviction and death sentence are

3    unconstitutional because the State destroyed exculpatory evidence – specifically, the mattress

4    from the motel room and the Kel tape discussed above in relation to Claim One.  Wilson proffers

5    no convincing evidence of wrongful conduct by the prosecution.  More to the point, he cannot

6    establish, for reasons discussed above, that his defense was prejudiced by the unavailability of

7    either item.

8              Claim Thirteen is denied.

9              *Claim Fourteen*

10             In Claim Fourteen, Wilson alleges that his conviction and death sentence are

11   unconstitutional due to prosecutorial misconduct and ineffective assistance of counsel in relation

12   to Lynn Stefansky.  Wilson claims that the prosecution withheld exculpatory evidence and failed

13   to disclose that she lied regarding material facts in her testimony.  He also claims that a

14   reasonable investigation by counsel would have unearthed the withheld information.  According

15   to Wilson, the undisclosed evidence would have supported a defense theory that Stefansky, not

16   Wilson, initiated the scheme that resulted in Hoff's death and also could have been used to

17   impeach her testimony.

18             In particular, Wilson alleges that the State failed to disclose that the California warrant

19   Stefansky represented in her testimony as a petty theft conviction was actually a felony warrant

20   for stealing $45,000 of jewelry belonging to the deceased wife of an attorney.  In addition,

21   Wilson claims the State also concealed the fact that Stefansky had been arrested on a prostitution

22   charge in Reno and was "working off" that arrest by assisting with narcotics cases.  Finally,

23   Wilson also alleges that the State allowed Stefansky to perjure herself on cross-examination

24   when she testified that "she would not accept payment" for helping the police, but just did it "out

25   of the kindness of [her] heart." ECF No. 134 at 153 (citing ECF No. 145-3 at 142).

26             Stefansky testified on direct examination that she became familiar with the Reno Police

27

28                                          45

1  Department when they came to arrest her on an extradition warrant out of California for grand

2  larceny. ECF No. 154-3 at 123.  She also testified that, two days before the murder, Wilson

3  approached her about an acquaintance of his wanting to sell ten ounces of cocaine and asked her

4  whether she knew of anyone who would be interested. *Id*. at 126.  According to her testimony,

5  she then contacted Hoff and, later that day, gave Wilson a phone number to contact Hoff. *Id*. at

6  126-27.

7  When cross-examined by Brennan, Stefansky testified that she was convicted of petty

8  theft on the grand larceny charge after helping out the Reno Police Department. *Id*. at 138.  She

9  also testified that, when arrested on the California warrant, she was also charged with possession

10  of marijuana. *Id*.  Brennan also elicited from Stefansky that she had worked as a prostitute and

11  that Hoff had known that about her. *Id*. at 139-40.

12  Claim Fourteen does not provide grounds for habeas relief.  First, Wilson's allegations

13  are, for the most part, unsubstantiated.  He appears to be relying heavily on the deposition

14  testimony of a Reno police officer, Charles Reavis, who worked as a supervisor in the vice unit

15  at the time of the Hoff murder. Docket #50, Exhibit 12.  To the extent this court can consider the

16  deposition, which was not taken until 1991, it does not say as much as Wilson suggests it does.

17  According to Reavis' testimony, he knew about Stefansky because she had been arrested for

18  prostitution about four weeks prior to the Hoff murder. *Id*. at 17.  He testified that she offered "to

19  do some dope deals in exchange for the prostitution charge being reduced," so he handed her off

20  to the narcotics division and did not have much contact with her after that. *Id*.  As for the Hoff

21  deal, his "best recollection" was "that the deal that night was set up by or through Lynne in some

22  fashion, but I don't know how that was done." *Id*. at 17-18.

23  Other evidence proffered by Wilson indicates that Reavis was directly involved in the

24  arrest on the California warrant and the possession of marijuana charge. Docket #30, Exhibit 14,

25  pp. 2-3, 23-25.  So, his deposition testimony twelve years after the fact that he knew about

26  Stefansky as the result of a prostitution arrest may not have been accurate.  In any case, his

27

28

46

1    testimony does not show that Stefansky's assistance in the Hoff case, in particular, was

2    necessarily a matter of "working off" a prostitution charge.  And, while the specific allegations

3    underlying the California warrant may not have been disclosed, the prosecution did not conceal

4    the fact that Stefansky had been arrested on a felony warrant for grand larceny.  Wilson has also

5    not demonstrated that Stefansky lied when she testified that she was ultimately convicted of petty

6    theft on the grand larceny charge.  And, while Stefansky may not have been completely truthful

7    about assisting the police "out of the kindness of [her] heart," Wilson has not shown that she lied

8    about never being paid for helping the police.

9        Second, there is virtually no likelihood that any undisclosed evidence would have

10    changed the outcome of Wilson's trial. *See United States v. Dominguez Benitez*, 542 U.S. 74, 82

11    (2004) (noting that to prove prejudice under both *Brady* and *Strickland*, a defendant must show

12    "a reasonable probability" of a different outcome); *see also Giglio v. United States*, 405 U.S.

13    150, 154 (1972) (holding that a new trial is required only if the false testimony could in any

14    reasonable likelihood affected the judgment of the jury).  Even if Wilson could show that the

15    drug deal was originally Stefansky's idea, it would not significantly lessen his culpability in light

16    of evidence that, after being put in contact with Hoff, he made all the arrangements and took a

17    lead role in carrying out the robbery and murder.  As for challenging Stefansky's testimony, the

18    three-judge panel was provided enough information about her background to question her

19    credibility and to be suspicious of her motives for helping the police.  As to the latter, Brennan

20    effectively highlighted the point that her grand larceny charge was reduced to petty theft after

21    helping the Reno Police Department.

22        Claim Fourteen is denied.

23            *Claim Fifteen*

24        In Claim Fifteen, Wilson alleges that his conviction and death sentence are

25    unconstitutional due to prosecutorial misconduct and ineffective assistance of counsel in relation

26    to John Dollar.  Wilson claims that the prosecution withheld exculpatory evidence and engaged

27

28                                47

in fraud in presenting his testimony.  In particular, he claims that the State concealed the true nature of Dollar's plea negotiations, misrepresentations Dollar had made in his pre-sentence investigation report, and several other backgrounds facts undermining Dollar's credibility. Wilson also claims that the State helped Dollar prepare for his penalty hearing testimony. Finally, Wilson alleges in Claim Fifteen that counsel failed to conduct a reasonable investigation into Dollar's background or adequately prepare to cross-examine him.

As discussed above, Brennan provided ineffective assistance of counsel by relying on Dollar's grand jury testimony as a reason to recommend that Wilson enter a guilty plea to kidnaping.  However, this court is not persuaded that there is a reasonable probability that any prosecutorial misconduct or ineffective assistance of counsel in relation to Dollar would have changed the outcome of Wilson's penalty hearing.

While Dollar's grand jury testimony was placed into evidence, the State's direct examination of Dollar at the penalty hearing focused on his trip to Las Vegas with Lani and Stites. ECF No. 145-3 at 194-201.  On cross-examination, Dollar gave the implausible account of Lani's participation in the alleged kidnaping recounted above in the court's discussion of Claim Five.  Again, the three-judge panel's rejection of kidnaping as an aggravating circumstance with respect to Lani suggests that the panel did not accept Dollar's testimony as accurate on this point. Dollar did not provide any other testimony bearing on Wilson that had a reasonable probability of impacting the death verdict.

Claim Fifteen is denied.

*Claim Sixteen*

In Claim Sixteen, Wilson alleges that his conviction and death sentence are unconstitutional due to prosecutorial misconduct in relation to James McCall, William Mendenhall, and Thomas Rogers.  For each of these witnesses, he claims that the prosecution withheld exculpatory evidence that could have been used to impeach their testimony.  He also alleges counsel was ineffective by not adequately investigating and cross-examining these

48

witnesses.

With respect to McCall, Wilson alleges that the prosecution failed to disclose considerations it gave to McCall in exchange for his testimony and concealed information that McCall had perjured himself in his own trial, lied about having met Wilson in jail, and had a propensity to manipulate the system.  He also alleges that the prosecution wrongfully called him as a witness knowing that it would generate a conflict of interest for Brennan.

McCall's testimony is recounted above in the court's discussion of Claim Eight.  He provided details of the attack on Hoff that he claims Olausen had told him.  Even without that testimony, however, there was ample evidence presented to the three-judge panel demonstrating how Wilson's co-defendants killed Hoff.  McCall's testimony regarding Wilson, specifically, consisted of little more than Wilson supposedly saying that the killing was self-defense and he was going to hire F. Lee Bailey, and McCall characterizing Wilson as arrogant.  Consequently, there is not a reasonable probability that any prosecutorial misconduct or ineffective assistance of counsel in relation to McCall would have changed the outcome of Wilson's penalty hearing.

As for Mendenhall, Wilson claims the prosecution did not disclose that he had committed numerous felonies, received significant favors in exchange for his testimony, and committed perjury.  The undisclosed information Wilson cites is essentially the same information as the information he cites in his IAC claim (i.e., Claim Nine(E), above).  Because the prejudice standard prejudice does not differ from the *Strickland* standard, Wilson's *Brady* claim in relation to Mendenall fails for the same reasons Claim Nine(E) fails.

Finally, as to Rogers, Wilson claims the prosecution concealed favorable treatment on pending felony charges that was extended to Rogers in exchange for his testimony.  He also claims the State failed to disclose that Rogers lied in his testimony about the reason for his previous incarceration and that Rogers had a history of mental health problems.

On direct examination, the prosecution first elicited from Rogers that he was currently in jail for "uttering fictitious check and possession of fictitious check." ECF No.146-1 at 43.

Rogers then testified that he had a conversation with Lani about the Hoff case while they were both in the Washoe County jail and that Lani had told him that he wanted to talk to the district attorney about making a deal. *Id*. at 44. He also testified that he also spoke with Stites and that Stites told him that he knew prior to the murder that Hoff was a police officer and that they had planned to kill him so they could not be identified. *Id*. at 45-46. On cross-examination, Rogers testified that he was currently in jail on new charges and that when he gave his statement to the district attorney, he was finishing up a one-year sentence that was concurrent with a Nevada State Prison sentence. *Id*. at 47. Mendenhall subsequently testified that Rogers had a reputation in jail as a snitch. *Id*. at 71.

Here again, Wilson fails to meet the prejudice requirement under *Brady* and *Strickland*. The three-judge panel was provided ample reason to question Rogers' credibility. Murder of a peace officer was among the aggravating circumstances alleged by the State. ECF No. 145-2. The panel's decision to not find the circumstance with respect to any of the defendants indicates that it gave little weight to Rogers' testimony. It is very unlikely that any undisclosed information regarding Rogers would have changed the panel's verdict with respect Wilson.

Claim Sixteen is denied.

V. CONCLUSION

For the reasons set forth above, Wilson is not entitled to habeas relief.

*Certificate of Appealability*

Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on

50

1   the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

2   assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473,

3   484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings,

4   a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid

5   claim of the denial of a constitutional right and (2) whether the court's procedural ruling was

6   correct.  *Id.*

7          The COA standard is not high.  Wilson must only "'sho[w] that reasonable jurists could

8   debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement

9   to proceed further.'" *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations

10  omitted).  Having reviewed its determinations and rulings in adjudicating Wilson's petition, the

11  court concludes that the *Slack* standard is met with respect to the scope of evidence this court is

12  permitted to consider in resolving Wilson's claim that counsel was ineffective in failing to

13  investigate and present mitigating evidence in the penalty phase (Claim Nine(A-D)) --

14  specifically, whether this court is correct that it is not permitted to consider evidence that was not

15  before the state court when the state court decided the claim in Wilson's initial state PCR

16  proceeding.  The court declines to issue a certificate of appealability for its resolution of any

17  other procedural or substantive issues.

18         **IT IS THEREFORE ORDERED** that Wilson's third amended petition for writ of

19  habeas corpus (ECF No. 134) is DENIED.  The Clerk shall enter judgment accordingly and close

20  this case.

21  \ \ \

22  \ \ \

23  \ \ \

24  \ \ \

25  \ \ \

26  \ \ \

27

28
                                        51

**IT IS FURTHER ORDERED** that a COA is granted as to the court's resolution of the following issue:

> Whether this court erred in determining that it cannot consider evidence not before the state court when the state court decided in petitioner's initial PCR proceeding that trial counsel was not ineffective in failing to investigate and present mitigating evidence in the penalty phase of petitioner's trial.

A COA is otherwise denied.

Dated: April 11, 2025

_____

U.S. District Judge Gloria M. Navarro

52